IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|   |   |   |
|---|---|---|
| THE BANCORP BANK., | : | |
| Plaintiff (terminated), | : | |
| v. | : | CIVIL NO. 07-CV-1907 |
| | : | |
| MATTHEW R. ISAACS, | : | |
| Defendant, Third-Party | : | |
| Plaintiff, Counterclaim | : | |
| Defendant | : | |
| | : | |
| v. | : | |
| | : | |
| WILSON'S BLUE RIBBON | : | |
| MANAGEMENT CO., et. al. | : | |
| Third-Party Defendants, | : | |
| Counterclaim Plaintiffs, | : | |
| Third-Party Plaintiffs | : | |
| | : | |
| v. | : | |
| | : | |
| MICHELLE ISAACS, FAMILY FOODS | : | |
| MARKETING, INC., QUAKER | : | |
| VALLEY FOODS, BRIGHT STAR | : | |
| GROUP, LLC, KRAFT FOODS, INC., | : | |
| and THE MINUTE MAID COMPANY, | : | |
| Third-Party Defendants | : | |

## MEMORANDUM OPINION AND ORDER

**RUFE, J.**                                                    **March 25, 2010**

Before the Court are: (1) a Motion for Summary Judgment filed by Blackman, Silberman,

Costello, Wilson Blue Ribbon Management Company, Blue Ribbon Famous Foods, and Blue

Ribbon Commodity Traders (collectively "Blue Ribbon"), which asks the Court to dismiss

original defendant/ third-party plaintiff Matthew Isaacs' claims against them; (2) Matthew

Isaacs', his wife Michelle Isaacs', and Family Foods' Motions to Dismiss Blue Ribbon's counter

1

claims / third-party claims against them; and (3) four Motions to Dismiss Blue Ribbon's third-party claims filed by four additional third party defendants, Quaker Valley Foods, Inc. ("Quaker Valley"), Bright Star Group, LLC ("Bright Star"), Kraft Foods, Inc. ("Kraft"), and The Minute Maid Company ("Minute Maid").

For the reasons set forth below, the Court will grant Blue Ribbon's Motion for Summary Judgment. With the dismissal of Isaacs' claims against it on summary judgment, Blue Ribbon is no longer a third-party defendant, but steps into the role of the plaintiff with multiple claims against Matthew and Michelle Isaacs, Family Foods, Quaker Valley, Bright Star, Kraft, and Minute Maid. All of these defendants have filed Motions to Dismiss. The Motions to Dismiss filed by Matthew Isaacs, Michelle Isaacs, and Family Foods will be denied. The Motions to Dismiss filed by Quaker Valley, Bright Star, Kraft and Minute Maid will be granted in part and denied in part.

## Background

Howard Blackman, James Costello and Matthew Isaacs were co-owners of Blue Ribbon Commodity Traders, a company based in Pennsylvania. The company dealt in "unique food commodities," buying and selling product overruns, and mislabeled and mis-packaged products. Isaacs' role in the company was two-fold. He managed the traders, who were doing the buying and selling for the company, and he managed Blue Ribbon Famous Foods, a food repackaging plant in Wisconsin also owned in equal shares by Isaacs, Blackman and Costello.

Blue Ribbon alleges that Famous Foods operated at a loss every year. Blue Ribbon Commodity Traders, however, was profitable until July to November of 2006, when it saw a

2

precipitous decline in revenues. Blue Ribbon alleges that the decline in revenues was due to acts of dishonesty by nine of its traders ("the Traders"), who diverted business from Blue Ribbon by placing orders for the benefit of Bright Star (a competitor in the unique foods commodities business formed in 2005 by a prior co-owner of Blue Ribbon) and its financial backer Quaker Valley. It alleges that the Traders utilized the credit and goodwill of Blue Ribbon to divert business away from Blue Ribbon while still employed by the company.[1] Blue Ribbon also alleges that Isaacs was stealing and diverting money from Blue Ribbon, and that he was diverting sales from Blue Ribbon to his own new company, Family Foods, in part by using adapted Blue Ribbon order forms to trick companies into thinking they were still dealing with Blue Ribbon.

On November 17, 2006, because of the precipitous decline in revenues, Blue Ribbon failed to make payroll. During this same month, it also defaulted on its bank loan with original Plaintiff Bancorp. Blue Ribbon's business was collapsing, as it was unable to timely pay its accounts payable.

Blue Ribbon alleges that from the time Bright Star was formed in 2005, Bright Star and its financial backer Quaker Valley were making efforts to recruit Blue Ribbon's traders and Isaacs. Blue Ribbon further alleges that Bright Star and/or Quaker Valley successfully recruited the Traders and Isaacs, but only after Blue Ribbon failed to make payroll on November 17, 2006. Three or four days after Blue Ribbon failed to make payroll, the Traders, who were jointly responsible for 60% of the annual gross revenue of Blue Ribbon, resigned from Blue Ribbon and allegedly went to work for Bright Star or Quaker Valley. Isaacs also resigned as manager of

---

[1] Blue Ribbon alleges that it found evidence of such alleged business redirection in the Traders' computers after they resigned.

3

Famous Foods and vice president of Commodity Traders on November 30, 2006, although he continued to have a one-third interest in both companies and paid himself a salary as an officer until January 19, 2007.

After their resignations, Isaacs and the Traders are alleged to have continued to use Blue Ribbon's Famous Foods offices and access Blue Ribbon computers and databases until on or about December 9, 2006 when they were discovered by Blue Ribbon's private investigator. The private investigator recovered some Blue Ribbon computers from the offices, all of which had hard drives that had been corrupted, but he was not able to retrieve other company computers, including laptops and BlackBerrys.

Blue Ribbon further alleges that the Traders used confidential Blue Ribbon client contact information for the benefit of Bright Star and Quaker Valley between July and November 2006, in violation of their employment contracts, and continued to do so after their resignation from Blue Ribbon, in spite of having signed restrictive covenants prohibiting them from sharing confidential information with new employers for a period of two years post-resignation.[2]

Blue Ribbon alleges that Kraft and Minute Maid violated their exclusive deals with Blue Ribbon and took business to Isaac's Family Foods and other companies, including Quaker Valley and Bright Star, using Blue Ribbon's confidential client lists.

---

[2] At this point in the litigation, Blue Ribbon has evidence that one of the Traders signed a restrictive covenant, but pleads that it believes that the other Traders would have signed similar contracts.

## Procedural History

In August 2005 Blue Ribbon Commodity Traders, Inc. opened two lines of credit with The Bancorp Bank ("Bancorp"). Defendant Isaacs, a shareholder with one-third ownership interest in Blue Ribbon Commodity Traders, signed a surety agreement obligating himself to Bancorp if Blue Ribbon Commodity Traders defaulted on the loan. In November 2006, Blue Ribbon Commodity Traders did default on the loan, and Bancorp demanded immediate payment of the entire balance.

After Blue Ribbon Commodity Traders failed to pay, Bancorp filed a complaint for Confession of Judgment against Isaacs, personally, under the surety agreement. The complaint did not name the borrower, Blue Ribbon Commodity Traders, or the other equal shareholders, Blackman and Costello, who had also signed surety agreements for the loan. The amount owed was $2.3 million. Judgment of Confession was entered by the Court on May 10, 2007. Isaacs filed a motion to reopen judgment, which was granted on March 11, 2008.[3] Isaacs also filed a third party complaint, seeking indemnification and contribution from the borrower, Blue Ribbon Commodity Traders, and the other parties who had secured the loan: Blackman, Costello, Silberman (their attorney), Wilson's Blue Ribbon, and Blue Ribbon Famous Foods. Those parties (Blue Ribbon) filed counterclaims against Isaacs, and joined new third party defendants, Michelle Isaacs, Family Foods, Quaker Valley, Bright Star, Kraft and Minute Maid, to this matter pursuant to Fed. R. Civ. P. 19(a).

Just before the trial in this case was scheduled to begin in April 2008, Matthew Isaacs and his wife Michelle Isaacs filed for bankruptcy in the Western District of Wisconsin. Isaacs'

---

[3] Doc. No. 86.

personal indebtedness to Bancorp was discharged in bankruptcy[4] as it was an unsecured, non-priority debt. Therefore Bancorp is no longer a party to this litigation.

Blue Ribbon now moves for summary judgment of Matthew Isaacs' claims against them, since the debt for which he sought indemnification or contribution from Blue Ribbon was discharged in the bankruptcy. This issue will be addressed in Section A, below. Matthew Isaacs, Michelle Isaacs, and Family Foods have filed *pro se* Motions to Dismiss, which will be addressed in Section B(1). Quaker Valley, Bright Star, Kraft, and Minute Maid have each filed a Motion to Dismiss Blue Ribbon's claims against them, which will be addressed in Section B(2) below. The Court will also address Isaacs' request for a change in venue to the Western District of Wisconsin, in section C.

**Discussion**

### A.    Blue Ribbon's Motion for Summary Judgment of Isaacs's Claims[5]

Under Federal Rule of Civil Procedure 56(c), a court may grant summary judgment only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[6] A fact is "material" if it could affect the outcome of the suit, given the applicable substantive law.[7] A dispute about a material fact is "genuine" if the evidence

---

[4] United States Bankruptcy Court for the Western District of Wisconsin Case No. 08-11664, Doc. No. 38.

[5] Doc. No. 99.

[6] Fed. R. Civ. P. 56(c) (2009 Revised).

[7] Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

presented "is such that a reasonable jury could return a verdict for the nonmoving party."[8] In considering a summary judgment motion, the Court does not weigh the evidence or make credibility determinations; "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."[9]

When Bancorp filed the Complaint for Confession of Judgment against Isaacs after Blue Ribbon defaulted on its loan obligations, Isaacs filed claims against Blue Ribbon for indemnity (Counts I and II) and Contribution (Count III) *if Isaacs was held liable to Bancorp.*[10]

In April 2008, Isaacs and his wife, counterclaim defendant Michelle Isaacs, filed for Chapter 7 bankruptcy.[11] It is undisputed that Isaacs' obligations to Bancorp were discharged in bankruptcy,[12] and Bancorp is no longer a party to this lawsuit. Isaacs does not claim that he made any payments to Bancorp prior to or after the discharge of the debt. Since Isaacs has no liability to Bancorp, and has made no payments to Bancorp, the Court finds that Isaacs no longer has any claim for indemnity or contribution from Blue Ribbon, and Blue Ribbon is entitled to judgment as a matter of law. The Motion for Summary Judgment is granted and Isaac's Complaint against

---

[8] Id.

[9] Anderson, 477 U.S. at 255.

[10] Isaacs' response to the Motion for Summary Judgment asks, for the first time, for indemnification for unspecified attorneys' fees, which he claims he is entitled to under Blue Ribbon Commodity Trader's by-laws. While his Third-Party Complaint against Blue Ribbon does allege that if he is held liable to Bancorp, Blue Ribbon will owe "common law and/or contractual indemnity to Isaacs on Bancorp's claims," this assertion of his right to indemnification for money owed to Bancorp under an unspecified contract is insufficient to put Blue Ribbon on notice that Isaacs would seek indemnification for attorneys' fees under the by-laws.

Isaacs also claims that the Blue Ribbon defendants breached their fiduciary and ethical duties to him. These were not listed counts in his third-party complaint and Isaacs cannot belatedly raise these issues.

[11] The caption for the bankruptcy case also lists Family Foods.

[12] Case No. 08-11664, Doc. No. 38.

Blue Ribbon is dismissed in its entirety.

## B.    Motions to Dismiss

The remaining claims are Blue Ribbon's claims against Isaacs, Isaac's wife Michelle, and Family Foods, as well as Blue Ribbon's claims against Quaker Valley, Bright Star, Kraft and Minute Maid. Some of these claims are made under federal law (e.g. the Computer Fraud and Abuse Act (18 USC §1030), the Lanham Act (15 USC §1050), copyright laws (17 U.S.C. §101, *et seq*), and the Digital Millenium Copyright act (17 USC §1202)). Therefore, the Court continues to have jurisdiction over these claims under 28 U.S.C. § 1331, and will exercise supplemental jurisdiction[13] over the state law claims, including breach of fiduciary duty, fraud and misrepresentation, conversion of assets and business, intentional inference with contracts and business relationships.

Dismissal of a complaint pursuant to Rule 12(b)(6) of the Federal Rule of Civil Procedure for failure to state a claim upon which relief can be granted is appropriate where a plaintiff's "plain statement" does not "possess enough heft to 'show that plaintiff is entitled to relief.'"[14] In determining whether a motion to dismiss is appropriate the court must consider those facts alleged in the complaint, accepting the allegations as true and drawing all logical inferences in favor of the non-moving party.[15] Courts are "not bound to accept as true a legal conclusion couched as a factual allegation."[16] Something more than a mere *possibility* of a claim must be

---

[13] 28 U.S.C. §1367 (1990).

[14] Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 557 (2007).

[15] ALA v. CCAIR, Inc., 29 F.3d 855, 859 (3d Cir. 1994); Fay v. Muhlenberg Coll., No. 07-4516, 2008 WL 205227, at *2 (E.D. Pa. January 24, 2008).

[16] Twombly, 550 U.S. at 555.

alleged; the plaintiff must allege "enough facts to state a claim for relief that is plausible on its face."[17] The complaint must set forth direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory.[18]

## 1. Motions to Dismiss Filed by Matthew Isaacs, Michelle Isaacs, and Family Foods[19]

In response to Blue Ribbon's amended counterclaims,[20] Matthew Isaacs, Michelle Isaacs and Family Foods filed *pro se* Motions to Dismiss with their answers.[21] The Motions to Dismiss allege that Blue Ribbon has failed to state a claim against them. However, the Motions to Dismiss dispute facts found in the amended counterclaim, and rely upon additional factual allegations not found in the pleadings. When reviewing a 12(b) motion, the Court must accept all facts alleged in the complaint as true, and may not consider facts outside the pleadings. Blue Ribbon, therefore, asks the Court to consider these motions as motions for summary judgment and defer ruling on them until after the close of discovery in this case. Accordingly, as the arguments set forth by the movants do not comply with Rule 12(b) standards, the Court will deny the Motions to Dismiss and allow the movants to renew these arguments in a motion for summary judgment after discovery is completed. The moving parties have filed their answers of record and no further answers will be required. However, each and any of the parties may file an

---

[17] Id. at 570.

[18] Id. at 562.

[19] Doc. Nos. 74 (as to Matthew Isaacs, Michelle Isaacs and Family Foods) and 79 (as to Michelle Isaacs individually).

[20] Doc. No. 61.

[21] Although this is procedurally improper, the Court will give these *pro se* parties latitude and review the Motion to Dismiss and Blue Ribbon's response thereto.

9

amended answer within 20 days of the date of this memorandum opinion and order without further leave of the Court.

## 2. Motions to Dismiss Filed by Quaker Valley,[22] Bright Star Group,[23] Kraft Foods,[24] and Minute Maid[25]

a. Fraud (Count I)

A claim of fraud must plead: (1) a representation; (2) which is material to the transaction at issue; (3) made with knowledge of or recklessness to its falsity; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) an injury proximately caused by that reliance.[26] Fraud claims must be pled with particularity, except that the condition of mind of a person may be stated generally.[27]

Blue Ribbon alleges that Isaacs and the Traders acted as agents of third-party defendants Bright Star and Quaker Valley, and hence the latter are liable for any fraud committed by Isaacs and the Traders. At the time in question, the period prior to the Traders' November 30, 2006 resignations from Blue Ribbon, Isaacs and the Traders were not yet employees of Bright Star or Quaker. Therefore, Blue Ribbon's claim must include facts suggesting that 1) the agents (Isaacs and/or the Traders) acted with actual authority from Bright Star and Quaker Valley; or 2) Bright Star and Quaker Valley ratified the agents' conduct and the agents' conduct was tortious.

---

[22] Doc. No. 62.

[23] Doc. No. 64.

[24] Doc. No. 70.

[25] Doc. No. 75.

[26] Clinkscales v. Children's Hosp. of Philadelphia, 2007 WL 335604 (E.D. Pa. 2007).

[27] Fed. R. Civ. P. 9(b).

10

First, Blue Ribbon alleges that before their resignation from Blue Ribbon, Isaacs and the Traders placed orders for Quaker and Bright Star for delivery on dates after their resignation from Blue Ribbon, and that they did so as agents of Quaker Valley and Bright Star. Even assuming that Blue Ribbon has adequately pled a fraud claim against Isaacs, Blue Ribbon does not allege sufficient facts to state a plausible claim for the existence of an agency relationship between Isaacs and Quaker Valley or Bright Star prior to their resignation from Blue Ribbon.

Blue Ribbon goes on to allege that after the Traders resigned from Blue Ribbon on November 30, 2006, at least some of the Traders signed employment contracts with Quaker or Bright Star. Notwithstanding their resignations, they continued to work from their former Blue Ribbon offices in Wisconsin and use Blue Ribbon computers for their work. Blue Ribbon characterizes this as "fraudulent conduct" without setting forth factual support for each of the elements of fraud, and merely assumes an agency relationship without setting forth facts supporting such a conclusion. Therefore, the fraud claims against Bright Star and Quaker Valley are not sufficiently pled and must be dismissed.

As to Kraft and Minute Maid,[28] Blue Ribbon alleges that it had been included on an exclusive list of companies Kraft and Minute Maid allowed to distribute and sell its unique food commodities. Blue Ribbon, and the other companies on the list, were required to provide Kraft and Minute Maid with their customer lists and contact information. Kraft and Minute Maid allegedly made representations that they would keep these lists confidential.

---

[28] Blue Ribbon notes that Minute Maid did not move to dismiss the fraud claim against it. This may be due to Blue Ribbon's captioning of the fraud count in its counterclaim as applying only to Matthew and Michelle Isaacs. The Court *sua sponte* notes that the facts supporting Blue Ribbon's fraud allegation against Kraft and its fraud allegation against Minute Maid are fundamentally identical and it will address the sufficiency of both claims.

11

While Blue Ribbon does allege that Kraft and Minute Maid breached their obligations to keep the customer lists confidential, it does not plead the elements of fraud. Blue Ribbon does not plead that the representation that Kraft and Minute Maid would keep the list confidential was made with knowledge or recklessness as to its falsity and with the intent to mislead Blue Ribbon into entering into the exclusive distribution deal. It merely alleges that having so agreed, Minute Maid and Kraft then violated their agreement. Blue Ribbon does not allege facts that would permit the Court to infer that Kraft and Minute Maid made misrepresentations at the time the parties entered into the agreement, such as facts establishing proximity in time between the date the parties first entered into the distribution agreement and Minute Maid and Kraft's alleged distribution of the customer list. Therefore, the fraud claim against Kraft and Minute Maid must also be dismissed.

b.　　Civil Conspiracy (Count II).

Bright Star does not move to dismiss Blue Ribbon's civil conspiracy claim,[29] but Quaker Valley, Kraft and Minute Maid have each filed a motion to dismiss this count of the complaint.

In order to state a claim for civil conspiracy, Blue Ribbon must plead: (1) the composition of the alleged conspiracy; (2) the broad objectives of that conspiracy; (3) the parties' general role in the scheme; (4) the particular unlawful purpose; (5) the actual legal damages; and (6) an intent to injure Blue Ribbon.

The Court finds that the elements of this claim against Quaker Valley were adequately pled. Blue Ribbon named the parties involved, including Michelle and Matthew Isaacs, Bright Star, Quaker Valley Group, and others. Blue Ribbon outlined the objectives of the scheme,

---

[29] See Doc. No. 64.

12

alleging that the named parties intended to divert Blue Ribbon sales to other entities, including Quaker Valley and Bright Star, and steal Blue Ribbon's customers and trade dress. It alleges that Quaker Valley's general role in the scheme was to ask Isaacs and the Traders to divert sales for its benefit and to raid Blue Ribbon's computers for confidential information. Blue Ribbon alleges that these actions were taken with intent to injure, not just intent to compete. Finally, Blue Ribbon pleads monetary damages, including the precipitous decline in revenues from the Traders beginning in July 2006, leading to the inability to make payroll and pay its debts in November 2006. Therefore, the civil conspiracy claim will not be dismissed as to Quaker Valley.

The elements of a conspiracy claim against Kraft and Minute Maid, however, were not adequately pled. Blue Ribbon alleges that Kraft and Minute Maid's role in the conspiracy was to "disseminate Blue Ribbon's customer list" to Bright Star and Quaker Valley in violation of their duties to Blue Ribbon. Blue Ribbon does not clearly allege that it remained in the commodities business at the relevant times or that Kraft or Minute Maid had an intent to injure Blue Ribbon, as opposed to continuing their business interest in selling their unique foods after Blue Ribbon failed to make payroll and its Traders ceased buying and distributing them for Blue Ribbon.[30] Therefore, the allegations are insufficient to state a claim for civil conspiracy by Kraft and Minute Maid.

c.    Civil Aiding and Abetting (Count III)

The elements of civil aiding and abetting are set forth in Restatement (Second) of Torts, §

---

[30] Twombly, 550 U.S. at 552 (plaintiffs must allege facts that tend to exclude independent self interest as an explanation for defendant's behavior).

13

876 (Persons Acting in Concert).[31]  The Restatement provides that one is subject to liability for harm to a third person from the tortious conduct of another when he:

> (a)    Does a tortious act in concert with the other or pursuant to a common design with him, or
>
> (b)    Knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so conduct himself, or
>
> (c)    Gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

Restatement (Second) of Torts, § 876.

Blue Ribbon claims that individual employees of Quaker Valley and Bright Star went to Wisconsin on November 20 and November 21, 2006, helped prepare resignation letters for the Traders, and provided employment or contractor contracts for the Traders to work for Quaker Valley and Bright Star.  Blue Ribbon claims that Quaker Valley and Bright Star did this notwithstanding the Traders' non-compete clauses,[32] as part of a scheme to undermine Blue Ribbon's business interests. The language of the restrictive covenant the Traders are alleged to have signed prohibits them from divulging Blue Ribbon's trade secrets and confidential information for a period of two years following the termination of employment with Blue Ribbon.  The contracts, however, do not prohibit the Traders from seeking or accepting employment with competing companies in the unique foods industry.  Accordingly, even if each of the Traders signed similar contracts, and Quaker Valley and Bright Star were aware of those

---

[31] Fassett v. Delta Kappa Epsilon, 807 F.2d 1150, 1162 (3d Cir. 1986).

[32] As noted above (*Supra* Note 2), Blue Ribbon does not currently have proof that all nine traders signed contracts with similar non-compete clauses.

14

restrictive covenants, the allegations do not state a claim for aiding and abetting any improper activity as to the resignation of the Traders from Blue Ribbon and the hiring of those Traders by Quaker Valley and Bright Star.

The Complaint also states that Bright Star and Quaker Valley aided and abetted Isaacs and the Traders in wrongdoing by asking them to place orders for products before they officially resigned from Blue Ribbon, beginning in July 2006. Taking the facts alleged regarding knowledge and participation in the act as true, as the Court must for this analysis,[33] the Court finds that the aiding and abetting claims against Quaker Valley and Bright Star were adequately pled.

The Complaint alleges that Kraft and Minute Maid acted in concert with Isaacs to purposely divert Blue Ribbon sales, customers, and assets to Quaker Valley and Bright Star, by providing them with Blue Ribbon's customer lists, and also extending credit to Quaker Valley and Bright Star to facilitate those sales. Blue Ribbon, however, does not set forth any facts demonstrating that Kraft or Minute Maid were aware of and substantially participated in any tortious diversion of business from Blue Ribbon. As the customer list in question was developed by Isaacs and the Traders, no facts have been pled to support a claim that Isaacs and the Traders needed Kraft or Minute Maid to provide them with a customer list in order to engage in the alleged diversion of business to Quaker Valley and Bright Star.

d.    Copyright infringement (Count IV and XIII)

To state a claim for copyright infringement, Blue Ribbon must allege: "(1) ownership of a

_____

[33] Twombly, 550 U.S. at 557.

15

valid copyright; and (2) unauthorized copying of original elements of the plaintiff's work."[34] The copyrights Blue Ribbon claims were infringed (business forms) were registered on or about July 6, 2007, almost a year after the alleged infringement by Quaker Valley and Bright Star. Thus, this claim must be dismissed against Quaker Valley and Bright Star.

Blue Ribbon did not assert claims for copyright infringement against Kraft or Minute Maid.[35]

     e.    Lanham Act (Count V)

The Lanham Act[36] defines trademark infringement as "use of a mark so similar to that of a prior user as to be likely to cause confusion, or to cause mistake, or to deceive."[37] A plaintiff must show that the trademark is (1) valid and protectable (it need not be registered); (2) is owned by the plaintiff; (3) and the defendant's use of the mark is likely to cause confusion concerning the origin of the goods and services.[38]

Blue Ribbon claims that Quaker Valley and Bright Star adopted the trade dress Blue Ribbon used for processed chicken parts, including the package design, colors, arrangement of parts, and UPC code, creating consumer confusion. Blue Ribbon alleges that Quaker Valley and Bright Star initially even used the Blue Ribbon name, but later they just used "knock-off" packaging. Quaker Valley moves to dismiss this claim, but Bright Star group does not move to

---

[34] Kay Berry, Inc. v. Taylor Gifts, Inc., 421 F.3d 199, 203 (3d Cir. 2005)

[35] Doc. No. 83 at 7.

[36] 15 U.S.C. § 1125 (2006).

[37] Fredom Car, Inc. v. JP Morgan, 432 F.3d 463, 469 (3d Cir. 2005).

[38] A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198, 210 (3d Cir. 2000).

16

dismiss the Lanham Act claims against it.[39] The Court finds that the allegations as pled are sufficient to state a claim against Quaker Valley at this point in the litigation.

Blue Ribbon does not assert that Kraft and/or Minute Maid have violated the Lanham Act.[40] Therefore, the claims will be dismissed at to these parties.

### f.    Uniform Trade Secrets Act (Count VI)

Blue Ribbon claims that Quaker Valley, Bright Star, Kraft and Minute Maid all violated the Pennsylvania Uniform Trade Secrets Act,[41] which defines a trade secret to include customer lists that derive independent economic value from not being generally known or readily ascertainable.[42] To assert a claim, the plaintiff must allege that it made reasonable efforts to maintain the secrecy of the list.[43] A trade secret is misappropriated if it is acquired by a person "who knows or has reason to know that the trade secret was acquired by improper means," or if the trade secret of another is disclosed "without express or implied consent by a person who... acquired [it] under circumstances giving rise to a duty to maintain its secrecy or limit its use."[44] To state a claim under the Act, the complaint must allege: (1) the existence of a trade secret; (2) discovery of the trade secret by improper means, or disclosure or use of the trade secret in a manner constituting a breach of plaintiff's confidence; and (3) injury resulting to the plaintiff.

Kraft, Minute Maid, and Bright Star argue that Blue Ribbon failed to state a claim under

---

[39] See Doc. No. 64.

[40] Doc. No. 83 at 8.

[41] 12 Pa. C.S. § 5301 *et seq.* (2004).

[42] 12 Pa. C.S. §5302 (2004).

[43] Id.

[44] Id.

17

the Act, as it did not establish that the customer list was a trade secret and did not identify the efforts it made to keep the information secret. The Court finds that Blue Ribbon did allege that the customer list was not generally known, that it had taken reasonable steps to protect it (in the form of a confidentiality agreement), and that it derived independent economic value from the fact that it was not generally known. Therefore, the Court will not dismiss the claim as to these three parties.

Quaker Valley argues that Blue Ribbon did not allege that Quaker Valley was aware of the original source of information it obtained or that the contact list constituted a trade secret. However, Blue Ribbon did plead that Quaker Valley knew or should have known that Isaacs was a co-owner of Blue Ribbon and was in a position of confidence within the company, yet they accepted confidential client lists from him or his staff. Thus, the Court will also deny Quaker Valley's motion to dismiss this count of the Complaint.

g. Conversion of Business Information (Count VII)

A claim for conversion of business information is recognized under Pennsylvania law in accordance with Restatement of Torts § 759. To state a claim for conversion of business information, a party must allege acquisition of *confidential* business information through misconduct.[45]

Blue Ribbon argues that its counterclaims include claims that Quaker Valley and Bright Star converted Blue Ribbon's customer information, trade dress, trademarks, business forms, and website by raiding their computers. Of these items, only the customer information is confidential

_____

[45] See Ideal Aerosmith, Inc. v. Acutronic United States, Inc., 2007 U.S. Dist. LEXIS 91644, *26-27 (W.D. Pa. 2007).

18

information, and as it was allegedly acquired through misconduct, the motion to dismiss will be denied as to the customer lists. The motion to dismiss will be granted as to all other information listed in Blue Ribbon's Motion because that information was not *confidential* business information.

Blue Ribbon argues that Kraft and Minute Maid's alleged dissemination of Blue Ribbon's customer information to Quaker Valley and Bright Star also constitutes conversion of business information. While the counterclaim does allege that Kraft and Minute Maid wrongfully disseminated Blue Ribbon's customer list, it does not allege that they acquired it through misconduct. In fact, the counterclaim states that it was their regular business practice to require their distributors to provide them with a customer list. Therefore, these claims will be dismissed.

### h. Breach of Fiduciary Duty (Count VIII)

Generally, business relationships are not fiduciary relationships.[46] However, a business relationship may give rise to a fiduciary relationship when one party surrenders substantial control over some portion of his affairs to the other.[47] In a fiduciary relationship, the parties do not deal with each other on equal terms.[48]

Blue Ribbon clarifies that it did not intend to assert a direct claim for breach of fiduciary duty against Bright Star or Quaker Valley.[49] Therefore, the Court will grant their motions to dismiss on this count.

---

[46] Chrysler Credit Corp. v. B.J.M., Jr. Inc., 834 F.Supp. 813, 842 (E.D. Pa. 1993), citing Commonwealth v. E-Z Parks, 620 F.3d 1485 (3d Cir. 1994).

[47] Id.

[48] Id.

[49] Doc. No. 84 at 41.

19

Blue Ribbon argues that Kraft and Minute Maid had a fiduciary duty to maintain the confidentiality of Blue Ribbon's customer list, and breached this duty by providing customer information to Blue Ribbon's competitors. Blue Ribbon relies upon PTI Converted Paper Products, Inc. v. Stone Container Corp.[50] to support its position. In PTI, the defendant sold corrugated pizza boxes to the plaintiff, and the plaintiff sold the boxes to its customers. However, the agreement provided that the defendant would ship the boxes directly to the customers, using plaintiff's customer contact list, rather than having them first pass through plaintiff's possession. In breach of their agreement, defendant began selling pizza boxes directly to some of plaintiff's customers. The court denied defendant's motion to dismiss the breach of fiduciary duty claim, ruling that even a business relationship can give rise to a fiduciary relationship when one party surrenders substantial portions of some portion of his affairs to the other. The PTI court found that the plaintiff had arguably surrendered substantial portions of his affairs to the defendant in that case.

This case can be distinguished from PTI. Blue Ribbon does not allege sufficient facts regarding the surrender of control of substantial portions of its affairs in its dealings with Kraft and Minute Maid to overcome the presumption that the business relationships were contractual rather than fiduciary in nature. Furthermore, it is not clear from the third party Complaint whether Blue Ribbon was still operational at the time Kraft and Minute Maid allegedly shared the contested customer list. Therefore, the claims for breach of fiduciary duty will be dismissed.

---

[50] 1995 WL 434577 (E.D.Pa. July 24, 1995).

20

### i. Intentional Interference With Present and Future Contractual/ Business Relationships (Count IX and X)

To establish a claim for tortious interference with present contractual relations, a plaintiff must allege that the defendant *intentionally and improperly* interfered with their performance of contracts with third persons.[51] Under Pennsylvania law, the elements of a claim for tortious interference with existing contractual relations are: (1) the existence of a contractual relation between the claimant and a third party; (2) purposeful action by the opposing party specifically intended to harm the existing relation; (3) the absence of privilege to do so; and (4) resulting damages.[52]

To state a claim for tortious interference with prospective contractual relations, a plaintiff must allege (1) a prospective contractual relationship[53]; (2) a purpose or intent to harm the plaintiff by preventing the relationship from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occurrence of actual damage.[54] To state a cognizable claim, a complaint must allege that a particular contract or express offer was being contemplated by a plaintiff and/or third party that was improperly impeded by the defendant's action.

First. Blue Ribbon alleges that Quaker Valley and Bright Star hired the Traders despite

---

[51] Alvord -Polk, Inc. v. F. Schumacher & Co., 37 F.3d 996, 1014-15 (3d Cir. 1994).

[52] Simon Property Group, Inc. v. Palombaro, 2010 WL 331859 (W.D. Pa. January 28, 2010).

[53] Schulman v. J.P. Morgan Inv. Mgmt. Inc., 35 F.3d 799, 808 (3d Cir. 1994) (a prospective contract exists if there is an objectively reasonable probability that a contract will arise from the parties' current dealings).

[54] Silver v. Mendel, 894 F.2d 598, 602 (3d Cir.1990), cert. denied, 496 U.S. 926, 110 S.Ct. 2620, 110 L.Ed.2d 641 (1990).

restrictive covenants. The Court does not find that the facts as pled support a finding that Quaker Valley and Bright Star interfered with Blue Ribbon's present or future business relationships with the Traders, because notwithstanding their restrictive covenants regarding *disclosure* of Blue Ribbon information to subsequent employers, the Traders were free to leave Blue Ribbon and seek new employment, and Quaker Valley and Bright Star were free to recruit them.

Next, Blue Ribbon alleges that Quaker Valley and Bright Star interfered with its business relationship with Isaacs, whom they knew to be a manager and officer of Blue Ribbon, by inducing him to divert business from Blue Ribbon to their own benefit while Blue Ribbon was still operational. The Court finds sufficient allegations were pled to survive the motion to dismiss.

Finally, Blue Ribbon alleges that it had existing contractual relationships with Kraft and Minute Maid and other providers and buyers of commodities, and that Bright Star and Quaker Valley intentionally interfered with those relationships by inducing those companies to divert commodities from Blue Ribbon to Bright Star and Quaker Valley. Blue Ribbon alleges that some of the business was diverted while Blue Ribbon was still operational. Again, the Court finds that the allegations as pled are sufficient to overcome a motion to dismiss.

As to Quaker Valley and Blue Ribbon's intentional interference with prospective contracts, however, the Court finds insufficient allegations of any prospective contractual relationship in the counterclaims. Therefore, Blue Ribbon's intentional interference with prospective contracts claims against Bright Star and Quaker Valley will be dismissed.

Blue Ribbon does not state a claim for interference with current or prospective contractual relationships against Kraft or Minute Maid, as it failed to identify existing contracts

22

or prospective contracts which were interfered with by those entities, and it fails to establish that it was harmed by any alleged actions given its lack of clarity about the time line of events.

    j.    Unjust enrichment (Count XI)

A claim for unjust enrichment arises in quasi-contract when, *in the absence of an express or implied agreement between two parties*, one party conferred a benefit on a second party, the second party appreciated that benefit, and the retention of that benefit without providing compensation to the first party would be inequitable.[55] A theory of unjust enrichment is precluded when there is an express agreement between the parties.[56]

Blue Ribbon's claims for unjust enrichment against Bright Star or Quaker Valley were dismissed as withdrawn by Order dated February 24, 2009.[57]

Blue Ribbon alleges that Kraft and Minute Maid breached their duty to keep Blue Ribbon's client list confidential and benefitted financially from that breach. These allegations as pled state a claim for breach of contract, but they do not state a claim for unjust enrichment, because Blue Ribbon also alleges an express agreement governed the relationship between the parties.

    k.    Violation of Computer Fraud and Abuse Act (Count XII)

To state a claim for civil violations of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, the plaintiff must plead that a defendant intentionally accessed a protected computer

---

[55] Temple Univ. Hosp. Inc. v. Healthcare Mgmt. Alternatives, 832 A.2d 501 (Pa. Super. 2003).

[56] Villoresi v. Femminella, 856 A.2d 78, 84 (Pa. Super. 2004).

[57] Doc. No. 94.

23

without authorization, causing loss aggregating at least $5000 in value.[58] Compensatory damages are available under the statute.[59]

Blue Ribbon alleges that Quaker Valley and Bright Star, through the Traders, intentionally accessed Blue Ribbon computers after the Traders resigned from Blue Ribbon and signed employment contracts with Quaker Valley and/or Bright Star. The Traders allegedly accessed business information and records, damaged hard drives, erased data, and stole some computers. Blue Rihbon alleges that Quaker Valley and Bright Star used the misappropriated information (including business forms and website content) to mislead customers and divert business from Blue Rihhon. The Court finds that the allegations set forth in Blue Ribbon's third party Complaint are sufficient to state a claim for which relief can be granted if Blue Ribbon is successful on the merits.[60]

Blue Ribbon states that it did not assert a violation of the Computer Fraud and Abuse Act against Kraft or Minute Maid in its counterclaim.[61] Kraft and Minute Maid's Motions to Dismiss will therefore be granted.

## C.    Transfer of Venue

"For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."[62]

---

[58] 18 U.S.C. § 1030(g)(2008).

[59] P.C. Yonkers, Inc. v. Celebrations the Party & Seasonal Superstore, LLC, 428 F.3d 504, 510 (3d Cir. 2005).

[60] Id.

[61] Doc. No. 83 at 19.

[62] 28 U.S.C. §1404(a) (1996).

24

A case can be transferred to prevent the waste of time, energy and money, and to protect litigants and witnesses from unnecessary inconvenience and expense.[63]

Counterclaim defendants Matthew and Michelle Isaacs and Family Foods support a transfer of venue to Wisconsin, where the Isaacs reside. Conceding that the claims could have been brought in Wisconsin, the counterclaimants, Blue Ribbon, and the third party defendants Quaker Valley, Bright Star, Kraft and Minute Maid, have all objected to transfer of venue on the basis of inconvenience. Although the Court accepts Isaac's disputed allegation that the Traders are residents of Wisconsin, Blue Ribbon alleges that they work for companies located in the Philadelphia area (Quaker Valley and Bright Star). It appears to the Court that much of the evidence in this case will be found in computers recovered in Wisconsin and presumably moved to Blue Ribbon's Philadelphia headquarters. Documentary evidence regarding Blue Ribbon, Quaker Valley and Bright Star may be located in Pennsylvania. Most of the parties and many of the witnesses live or work in the Philadelphia area.

The Court notes that Isaacs chose to raise his non-compulsory third-party complaint in the Eastern District of Pennsylvania, and only later requested the transfer to the Western District of Wisconsin based on the financial inconvenience of litigating the case in Pennsylvania. Blue Ribbon asserts that litigating the case in Wisconsin would similarly represent an enormous drain on its resources, as it is no longer operating as a business, and is only operating to collect accounts receivable on behalf of creditor Bancorp. The Court further notes that, at this point in the litigation, the six parties constituting Blue Ribbon, who prefer to litigate the case in the Eastern District of Pennsylvania, have stepped into the role of the original plaintiff, and therefore

---

[63] Van Dusen v. Barrack, 376 U.S. 612, 616 (1964).

25

some deference must be paid to Blue Ribbon's choice of forum. Of the many parties contesting the counterclaims, four parties prefer to maintain the litigation in the Eastern District, and only Isaacs, his wife, and his company support a transfer to Wisconsin. All of the represented parties, except Minute Maid, have retained Philadelphia-based counsel. Although discovery has not yet commenced in this case, the Court notes that the case is now three years old[64] and this Court is already very familiar with factual allegations and the procedural history of the case, which will make proceeding to trial more expeditious. Accordingly, the Court will decline to transfer venue in this matter, finding that doing so would merely shift the inconvenience of trial in a distant forum to the non-moving parties.

An appropriate Order follows.

---

[64] Original Plaintiff, Bancorp, filed its complaint in the Eastern District of Pennsylvania in May 2007. The case was reassigned to this Court by the random reassignment process of the Eastern District of Pennsylvania in June 2009.